# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### September 10, 2013 Session

## STATE OF TENNESSEE v. DEMETRIUS HOLLINS

**Appeal from the Criminal Court for Shelby County**
**No. 09-05640     Lee V. Coffee, Judge**

---

**No. W2012-02001-CCA-R3-CD  - Filed November 25, 2013**

---

The defendant, Demetrius Hollins, appeals his Shelby County Criminal Court jury convictions of attempted second degree murder and especially aggravated robbery, challenging the sufficiency of the convicting evidence and the exclusion of certain evidence, as well as the imposition of consecutive sentencing.  Discerning no error, we affirm.

**Tenn. R. App. P. 3; Judgments of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the Court, in which THOMAS T. WOODALL and D. KELLY THOMAS, JR., JJ., joined.

Andrew M. Bonderud (on appeal); Samuel Rodriguez, III (at trial and on appeal); and Kevin P. Henson (at trial), Memphis, Tennessee, for the appellant, Demetrius Hollins.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel E. Willis, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Stacy McEndree, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

On September 1, 2009, the Shelby County grand jury charged the defendant with attempted first degree murder and especially aggravated robbery.  The trial court conducted a jury trial in May 2012.

At trial, Truman Greer testified that, on August 29, 2008, he stopped at a McDonald's restaurant on the way home from work with his co-workers, Calvin Walker and "Little Joe."  Mr. Greer parked in the McDonald's parking lot, and his co-workers walked toward the restaurant.  Mr. Greer remained in his car, and he decided to count the money he had received earlier from cashing his paycheck.  While he was counting his money, he

noticed a black man wearing a blue bandana to the left of his periphery; the bandana was covering the man's nose and mouth. Mr. Greer "just froze" when he saw the man, out of concern that the man would notice the cash he was holding. The man approached the car parked directly to the left of Mr. Greer's vehicle. Mr. Greer heard the man say something to the effect of, "Give me your money, sucker," followed by the "bang" of a gunshot, at which point Mr. Greer saw the victim slump over in the driver's seat of his vehicle. The gunman reached inside the victim's vehicle and took something from the victim's person. Mr. Greer watched the shooter run across the street and out of his line of vision. Mr. Greer ran inside the McDonald's to get assistance for the victim.

On cross-examination, Mr. Greer acknowledged that, in the statement he gave to the police on the evening of August 29, 2008, he described the gunman as either five feet, four inches or five feet, five inches tall and estimated his age to be between 19 and 20. Mr. Greer explained, however, that he was merely guessing, due to his very brief observation of the gunman.

Calvin Walker testified that, when Mr. Greer parked his vehicle in the McDonald's parking lot, he and Joseph Brown, or "Little Joe," got out of the car, and as they began walking toward the restaurant, a white Lincoln Town Car with three men inside nearly ran over them. The two gentlemen continued toward the restaurant. Mr. Walker opened the door for Mr. Brown, and before Mr. Walker could step inside, he heard a gunshot. Mr. Walker later gave a description of the three men to law enforcement officers, describing two of the men as having "braids and tweeds in their head" and stating that the other man was bald. Mr. Walker testified that one of the men "was young" but the other two men appeared to be in their mid-30s. Mr. Walker also recalled that the Lincoln had a "[b]lue or red rag top on it." After he heard the gunshot, Mr. Walker saw a man running away from the McDonald's. The man he saw fleeing from the scene had "little tweeds or braids in his head" and was wearing a white t-shirt and blue shorts. Mr. Walker did not notice a bandana. Mr. Walker told Mr. Brown to get help for the victim, and Mr. Walker took off his shirt and wrapped it around the head of the victim in an attempt to stop the bleeding from the gunshot wound.

Mr. Walker testified that the victim was "hysterical." Mr. Walker asked the victim if he knew the man who had shot him, and the victim told Mr. Walker that "he knew who had did it to him" although he did not give Mr. Walker a name. Mr. Walker observed that the victim had been shot in the head, and he stated that "blood was everywhere." Emergency medical personnel arrived five to 10 minutes later. Mr. Walker testified that he told law enforcement officers at the scene that the victim knew who had shot him. Mr. Walker also informed law enforcement officers that he was only able to see the side of the gunman's face as he was fleeing from the scene. Mr. Walker was never shown a

-2-

photographic lineup.  At trial, Mr. Walker positively identified the defendant as the man he saw running from the crime scene on August 29.

On cross-examination, Mr. Walker denied telling law enforcement officers on the evening of August 29 that the victim did not know who shot him.  When defense counsel provided Mr. Walker with a copy of his signed statement, Mr. Walker denied that the signature on the document was his.  Mr. Walker also denied telling the defendant's private investigator that the victim did not know who had shot him.

Joseph Brown testified that he accompanied Mr. Greer and Mr. Walker to a McDonald's restaurant on August 29 at the end of the work day.  Mr. Brown went inside the restaurant to place his order, and while he was in inside, he heard a gunshot.  Mr. Brown waited inside the restaurant for "a minute" before walking outside.  When he walked outside, he saw the victim "slumped over in the car" with "a whole lot of folks trying to help him."  Mr. Brown never spoke with anyone about the crime because he "didn't see nothing."

The victim, Willie Edwards, testified that he stopped at the McDonald's restaurant on August 29 before reporting for his shift at a Krystal restaurant.  After ordering his food inside the restaurant, he returned to his vehicle in the parking lot.  He opened his car door, placed his bag of food on the passenger seat, and sat down in the driver's seat, but before he was able to close the driver's door, a man approached him and demanded that Mr. Edwards "give [him] something."  When making this demand, the gunman lifted the hem of his shirt to reveal a small, black revolver.  Mr. Edwards took the gunman's demand to mean that he wanted money, and Mr. Edwards replied that he had nothing to give the man.  Mr. Edwards admitted at trial that he actually had $350 in cash in the right front pocket of his shorts.  After indicating to the gunman that he had no cash, Mr. Edwards next remembered waking up on the passenger side of his vehicle, holding the left side of his head behind his ear.  He was covered in blood and was in pain.  Mr. Edwards recalled a man at his side, instructing him to stay still and applying pressure to his head wound.  Mr. Edwards testified that he had never seen that man before and that he had not seen him since the shooting until he arrived at court to testify.  Mr. Edwards did not recall speaking to any law enforcement officers at the scene of the shooting.

Mr. Edwards described the gunman as a dark-skinned male with short braids in his hair.  Mr. Edwards did not recall anything covering the gunman's face.  He testified that he had seen the gunman before because the gunman "used to stay in the same apartments that [Mr. Edwards'] sister used to stay in" and where Mr. Edwards formerly resided when he was a teenager.  Mr. Edwards stated that he had seen the gunman around the Tulane apartment complex nearly every day "[f]or about six months to a year."  Mr. Edwards stated that the gunman's apartment was "one door down" from Mr. Edwards' sister's apartment.

At the time of the shooting, Mr. Edwards had not seen the gunman in five to six years.

Mr. Edwards testified that he recalled arriving at the hospital in the ambulance but that he remembered nothing after that point until he awoke in the hospital with staples on the left side of his head and a large scar behind his ear. He stated that he has lost all hearing in his left ear. Mr. Edwards testified that a law enforcement officer spoke with him after he awoke from surgery on August 30, and Mr. Edwards informed the officer that he knew who had shot him, identifying the gunman by his nickname, "Main." Mr. Edwards provided the officer with identifying information about the gunman, including the name of the gunman's girlfriend and the address of the apartment where the gunman formerly resided. Mr. Edwards testified that, after providing the officer with this information, the officer returned later that same day with a photographic lineup, from which Mr. Edwards immediately identified the defendant as the man who shot him. Mr. Edwards stated that he did not realize the defendant had stolen his $350 until he was released from the hospital.

On cross-examination, Mr. Edwards acknowledged that, when he was residing at the Tulane apartments, he did not know the defendant but that rather he was someone Mr. Edwards would see in passing. He agreed that he had no disagreements or altercations with the defendant while living at the Tulane apartments. Mr. Edwards testified that he did not recall anything he might have said to Mr. Walker at the scene of the shooting before emergency medical personnel arrived, nor did he recall speaking to law enforcement officers shortly after the shooting.

On redirect examination, Mr. Edwards acknowledged that he had spoken with Mr. Walker and some other people while in a waiting room prior to his testimony. He denied speaking with any of them about the case or discussing their testimony.

Sergeant Charles C. Smith with the Memphis Police Department ("MPD") testified that, on August 29, 2008, he was assigned to Felony Response and was called to a shooting at a McDonald's restaurant. When he arrived at the scene, he encountered a grey Ford Escort with an open driver's door. He noticed what appeared to be blood on the driver's seat, as well as a McDonald's drink cup and bag of food located on the console between the front seats. Mr. Edwards had already been removed from the vehicle and transported to the hospital. On cross-examination, Sergeant Smith acknowledged that one of the witnesses to the shooting described seeing a white Lincoln Town Car with a tan top and Mississippi tags at the scene, but the sergeant admitted that the MPD did not issue an "APB" on the vehicle.

MPD Lieutenant Byron Hardaway testified that his supervisor sent him to the Regional Medical Center ("the Med") on August 29 to ascertain the condition of a shooting

victim. Once Lieutenant Hardaway arrived at the Med, he spoke with the trauma center physician, who informed him that the victim, Mr. Edwards, was in critical condition but was alert. Lieutenant Hardaway was directed to a trauma room, where he encountered Mr. Edwards lying on a gurney with his eyes open, awaiting a "CAT" scan. Lieutenant Hardaway testified that he introduced himself and asked Mr. Edwards if he knew who shot him, to which Mr. Edwards replied, "I don't know." Lieutenant Hardaway stated that Mr. Edwards' speech was slurred and barely comprehensible. Believing Mr. Edwards to be under the influence of medication, Lieutenant Hardaway decided not to speak with him any further at that time.

MPD Officer Terrence Holt testified that he was the first officer to arrive on the scene of the shooting on August 29. When he arrived, he noticed a crowd gathered around Mr. Edwards' vehicle. Mr. Edwards was slumped over in the driver's seat of the vehicle with his left leg hanging out of the driver's side door, and he was rocking back and forth and bleeding from a head wound. Officer Holt attempted to question Mr. Edwards, but Mr. Edwards could not respond. Officer Holt testified that it appeared as if Mr. Edwards wanted to speak to him but was unable to do so.

MPD Sergeant J.D. Smith testified that he was with the Robbery Bureau in August 2008. Mr. Edwards' case was assigned to him on August 30, at which time Sergeant Smith and his partner proceeded to the Med to speak with Mr. Edwards. When Sergeant Smith arrived, Mr. Edwards' head was bandaged, and Sergeant Smith described Mr. Edwards' demeanor as "calm and simple." When Sergeant Smith inquired who had shot Mr. Edwards, Mr. Edwards responded that he knew the gunman, whom he knew as "Main," from the Tulane Apartments where "Main" had resided with his girlfriend, Wanda. Sergeant Smith used this information to determine that the defendant was the man known as "Main." Sergeant Smith then compiled a photographic lineup, which he presented to Mr. Edwards, and Mr. Edwards "immediately" identified the defendant as the man who shot him.

On cross-examination, Sergeant Smith acknowledged that his superior officer did not agree to issue an arrest warrant immediately after Mr. Edwards' identification of the defendant from the photographic lineup, believing that not enough evidence existed to issue a warrant at that time.

With this evidence, the State rested its case. Following the trial court's denial of the defendant's motion for judgment of acquittal and a *Momon* colloquy, *see Momon v. State*, 18 S.W.3d 152, 161-62 (Tenn. 1999), the defendant elected not to testify but did choose to present proof.

MPD Sergeant Investigator Robert Tutt testified that he interviewed Mr.

Walker following the shooting on August 29. In the course of that interview, Sergeant Tutt asked Mr. Walker if he had spoken with the victim, and Mr. Walker responded that he had asked the victim who had shot him. Sergeant Tutt stated that Mr. Walker told him "that the victim had been shot in the head and he wasn't talking" and that "he wasn't really saying anything." Sergeant Tutt testified that Mr. Walker also told him that the victim "said he didn't know who shot him." Sergeant Tutt testified that it was his practice to ask witnesses to review and sign their statements, and he stated that he had never forged a signature on a witness's statement.

Private investigator Lorea Negroni testified that she interviewed Mr. Walker at the behest of the defendant on May 11, 2011, at Mr. Walker's place of employment. Ms. Negroni testified that Mr. Walker was "very open," describing what he had seen on August 29, 2008, and providing Ms. Negroni with his telephone number in the event that she needed to speak with him again. Ms. Negroni stated that Mr. Walker told her that he had asked the victim who had shot him and that the victim replied that he did not know. Ms. Negroni described the interview as "pleasant" and denied that Mr. Walker had been uncooperative with her.

Based on this evidence, the jury convicted the defendant as charged of especially aggravated robbery and the lesser offense of attempted second degree murder. Following a sentencing hearing, the trial court sentenced the defendant to 20 years on the attempted second degree murder conviction, to be served consecutively to a 40-year sentence for the especially aggravated robbery conviction, for an effective sentence of 60 years.

Following the denial of his timely but unsuccessful motion for a new trial, the defendant filed a timely notice of appeal. In this appeal, the defendant argues that the evidence adduced at trial was insufficient to support his convictions and that the trial court erred by excluding the testimony of defense witness, Laurel Miles. In addition, the defendant argues that the sentence imposed was excessive. We consider each claim in turn.

*I. Sufficiency*

The defendant first contends that the evidence was insufficient to support his convictions of attempted second degree murder and especially aggravated robbery. We disagree.

We review the defendant's claim of insufficient evidence mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324

(1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Id.* Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

As charged in this case, "[e]specially aggravated robbery is robbery as defined in § 39-13-401 . . . [a]ccomplished with a deadly weapon; and . . . [w]here the victim suffers serious bodily injury." *Id.* § 39-13-403(a). "Second degree murder is . . . [a] knowing killing of another." T.C.A. § 39-13-210. "A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." *Id.* § 39-11-302(b). "A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense . . . [a]cts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part[.]" *Id.* § 39-12-101(a)(2).

Here, the proof adduced at trial established that the defendant approached Mr. Edwards in the McDonald's parking lot and demanded that Mr. Edwards "give [him] something," while lifting the front of his shirt to reveal a handgun. When Mr. Edwards stated that he had nothing for the defendant, the defendant shot Mr. Edwards one time in the head, stole $350 from Mr. Edwards' pocket, and fled the scene. The shooting caused permanent hearing loss in Mr. Edwards' left ear. Both Mr. Edwards and Mr. Walker positively identified the defendant as the shooter, and Mr. Edwards explained that he recognized the defendant because the two had, at one time, lived in the same apartment complex for several months.

The defendant argues that the State's eyewitnesses provided inconsistent descriptions of the assailant and stresses that Mr. Edwards initially told Sergeant Hardaway that he did not know who had shot him. In addition, the defendant points to the testimony of defense witnesses Sergeant Tutt and Ms. Negroni, both of whom claimed that Mr. Walker stated that the victim could not identify the shooter. The jury heard all of this testimony and clearly believed the State's witnesses, as was their prerogative. Questions of witness credibility and all factual issues are resolved by the jury. *See Cabbage*, 571 S.W.2d at 835.

Viewing this evidence in the light most favorable to the prosecution, we hold the evidence adduced at trial sufficiently established that the defendant robbed and attempted to murder the victim and thus is guilty of attempted second degree murder and especially aggravated robbery.

## II. Witness Testimony

The defendant next contends that the trial court erred in excluding the testimony of defense witness, Laurel Miles, offered for the sole purpose of attacking the credibility of the State's eyewitnesses. The trial court conducted a hearing outside the presence of the jury, at which the defense argued that Ms. Miles had observed the State's eyewitnesses conversing in a holding room prior to testifying. The defense advanced the theory that the four men were discussing the case, which led Mr. Walker to change his testimony as to whether Mr. Edwards knew who had shot him. The trial court determined that the proffered testimony of Ms. Miles was irrelevant and thus should be excluded. However, the trial court allowed the defense to examine Ms. Miles outside the jury's presence to make an offer of proof.

Laurel Miles, a recent college graduate who had studied criminal justice, testified that she had observed the entire trial out of personal interest. Ms. Miles testified that, prior to the testimony of Mr. Greer, Mr. Brown, Mr. Walker, and Mr. Edwards, she observed the four gentlemen "sitting in the clear holding area" having "a casual conversation." She stated that she was unable to hear anything that the men said. Ms. Miles observed that the four gentlemen were "pretty close together having a conversation." On cross-examination, Ms. Miles clarified that two of the men were sitting next to one another on a bench and the other two men were standing nearby.

In excluding this testimony, the trial court stated that it could not function as rebuttal testimony because there was nothing to rebut:

> Had [Mr. Edwards] told the jury that, "No, I did not have any conversations with anyone in the witness room," it would be proper rebuttal at that point, if there was a witness that would [say] that, "Yeah, I actually saw him talking to folks in the witness room." But what he has testified to is that he did, in fact, have a conversation with these folks, but he did not talk to them about anything relating to the substance of his testimony, did not talk to – did not discuss the case with any of the witnesses.

. . .

So the testimony from the witness, purported witness, would be, "I saw conversation." Apparently cannot say, "I heard conversation," cannot say exactly what may have been heard or what may have been said, cannot say that she actually saw these people talking about the case, but she saw them talking, and . . . Mr. Edwards did, in fact, tell the jury that he did have conversations with the people in the witness room but it was simply saying hello.

Now, people say hello a lot of different ways. Some people can say, "Hello, how are you doing," and some people can say, "Hello," and start talking about the Grizzlies or the weather or a lot of other things, but he clearly said, "We had no conversations about the case," so it would not be rebuttal to say that, yeah, they did have conversations, they were talking. . . .

. . . .

So if this evidence were presented, what I'm being asked to do is to allow the jury to speculate that Mr. Edwards was not telling the truth and that they might have [been] talking about the case, and the [c]ourt has told the jury that they cannot base the verdict on speculation, that it has to be based on the facts, on the evidence and on the law, and there is nothing on the record that would indicate that Mr. Edwards has not told the truth about whether or not he had conversations about the case, . . . .

. . . .

And for those reasons, the [c]ourt will find that the purported testimony from that witness would not be relevant, under 401. It's not admissible, under 402, and the danger of unfair prejudice substantially outweighs any probative value that that testimony could happen [sic] and would simply lead the jury to go back and start speculating, and that is something that they cannot do, . . . .

Questions concerning evidentiary relevance rest within the sound discretion of

the trial court, and this court will not interfere with the exercise of this discretion in the absence of a clear abuse appearing on the face of the record. *See State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997); *State v. Van Tran*, 864 S.W.2d 465, 477 (Tenn. 1993); *State v. Harris*, 839 S.W.2d 54, 73 (Tenn. 1992). An abuse of discretion occurs when the trial court applies an incorrect legal standard or reaches a conclusion that is "illogical or unreasonable and causes an injustice to the party complaining." *State v. Ruiz*, 204 S.W.3d 772, 778 (Tenn. 2006) (citing *Howell v. State*, 185 S.W.3d 319, 337 (Tenn. 2006)); *see also State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999).

Relevant evidence is evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. "Evidence which is not relevant is not admissible," Tenn. R. Evid. 402, and even if evidence is deemed relevant, it may be still be excluded "if the probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403.

We see no abuse of discretion in the trial court's decision to exclude the testimony of Ms. Miles. Because Mr. Edwards admitted conversing with the other State's witnesses prior to testifying, Ms. Miles's testimony that she saw the four men engaged in conversation would in no way rebut Mr. Edwards' testimony. Moreover, the fact that Ms. Miles was unable to hear the gentlemen's conversation rendered her testimony irrelevant because it offered nothing in the way of facts of consequence to the determination of this case. Accordingly, the exclusion of Ms. Miles's testimony was not error.

The defendant also argues that the trial court's decision to exclude the testimony of Ms. Miles violated his Sixth Amendment right to confront witnesses against him. The defendant did not make this argument before the trial court, however, and "[i]ssues raised for the first time on appeal are considered waived." *State v. Johnson*, 970 S.W.2d 500, 508 (Tenn. Crim. App. 1996). Moreover, as acknowledged by the defendant in his argument before this court, the Confrontation Clause is inapplicable in situations involving impeachment of an adverse witness through a third-party witness. The Sixth Circuit Court of Appeals has stated that, "[w]ith respect to a defendant's ability to present extrinsic evidence for impeachment, moreover, this court has noted that the Supreme Court has not recognized the sweep of the Confrontation Clause 'to encompass the right to impeach an adverse witness by putting on a third-party witness.'" *Jordan v. Warden, Lebanon Corr. Inst.*, 675 F.3d 586, 597 (6th Cir. 2012) (quoting *Harrington v. Jackson*, 1 F. App'x 367, 370 (6th Cir. 2001)); *see also Nevada v. Jackson*, 133 S. Ct. 1990, 1994 (2013) (citing *Delaware v. Fensterer*, 474 U.S. 15, 22 (1985), and *Jordan*, 675 F.3d at 596 and stating that "this Court

has never held that the Confrontation Clause entitles a criminal defendant to introduce *extrinsic evidence* for impeachment purposes"). The defendant's reliance on this argument is misplaced, and we need not consider it any further.

*III. Sentencing*

Finally, the defendant challenges the sentence imposed by the trial court, arguing that the trial court erred by ordering consecutive service of the sentences. The defendant does not, however, frame his argument as a traditional challenge to sentence alignment but rather contends that the consecutive service of sentences for attempted second degree murder and especially aggravated robbery violates principles of double jeopardy. We disagree.

Double jeopardy principles embodied in the Fifth Amendment to the United States Constitution protect defendants from twice being placed in jeopardy for the same offense by barring (1) a second prosecution for the same offense following acquittal, (2) a second prosecution for the same offense after conviction, and (3) multiple punishments for the same offense. *North Carolina v. Pearce*, 395 U.S. 711, 717 (1969); *Benton v. Maryland*, 395 U.S. 784 (1969); *see also* Tenn. Const. art. I, § 10; *State v. Watkins*, 362 S.W.3d 530, 548 (Tenn. 2012). "Whether multiple convictions violate double jeopardy is a mixed question of law and fact," which appellate courts review de novo with no presumption of correctness. *Watkins*, 362 S.W.3d at 539.

In *Watkins*, our supreme court rejected the analysis for double jeopardy questions found in *State v. Denton*, 938 S.W.2d 373 (Tenn. 1996), and it adopted in its place "the *Blockburger [v. United States*, 284 U.S. 299, 304 (1932)] same elements test currently utilized by the federal courts and the vast majority of our sister states." *Watkins*, 362 S.W.3d at 556. The threshold inquiry is whether the convictions at issue arose out of the "same act or transaction." *Id.* If that question is answered in the affirmative, then the court must determine whether the statutory elements are the same. *Id.* at 557. If, however, "each offense includes an element that the other does not, the statutes do not define the 'same offense' for double jeopardy purposes, and we will presume that the Legislature intended to permit multiple punishments." *Id.*

In the instant case, the defendant's convictions unquestionably arose from the "same act or transaction." The defendant demanded that Mr. Edwards "give him something" while raising his shirt to reveal the handgun in his waistband. When Mr. Edwards did not comply, the defendant shot him in the head, causing serious bodily injury, and stole his money. Turning to the elements of the two crimes, especially aggravated robbery involves the knowing or intentional theft of property from a person, accomplished with a deadly

weapon and resulting in serious bodily injury to the victim. T.C.A. §§ 39-13-401, -403. Second degree murder is the knowing killing of another, T.C.A. § 39-13-210(a)(1), and criminal attempt is defined as "acting with the kind of culpability otherwise required for the offense" while intending "to cause a result that is an element of the offense" and believing "the conduct will cause the result without further conduct on the person's part[,]" *id.* § 39-12-101(a)(2). Clearly, each of these offenses contain elements the other does not. Especially aggravated robbery must involve a theft, must be accomplished with a deadly weapon, and must cause serious bodily injury, whereas attempted second degree murder involves the intent to kill someone. As such, separate convictions of attempted second degree murder and especially aggravated robbery do not violate principles of double jeopardy.

Although the defendant does not appear to take issue with the trial court's findings, we find no error in the trial court's decision to impose consecutive sentencing. When a defendant is convicted of multiple crimes, the trial court may order the sentence to be served consecutively if it finds by a preponderance of the evidence that a defendant falls into one of seven categories listed in Tennessee Code Annotated section 40-35-115. They are:

> (1) The defendant is a professional criminal who has knowingly devoted the defendant's life to criminal acts as major source of livelihood;
>
> (2) The defendant is an offender whose record of criminal activity is extensive;
>
> (3) The defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences;
>
> (4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high;
>
> (5) The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship

between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims;

(6) The defendant is sentenced for an offense committed while on probation; or

(7) The defendant is sentenced for criminal contempt.

T.C.A. § 40-35-115(b). The existence of a single category is sufficient to warrant the imposition of consecutive sentences. *See State v. Adams*, 973 S.W.2d 224, 231 (Tenn. Crim. App. 1997). In *State v. Wilkerson*, 905 S.W.2d 933 (Tenn. 1995), the supreme court imposed two additional requirements for consecutive sentencing when the "dangerous offender" category is used: the court must find that consecutive sentences are reasonably related to the severity of the offenses committed and are necessary to protect the public from further criminal conduct. *Id.* at 937-39; *see State v. Imfeld*, 70 S.W.3d 698, 707-08 (Tenn. 2002).

In the instant case, the trial court based its decision to order consecutive sentencing on findings that the defendant had an extensive history of criminal activity and that the defendant was a dangerous offender. *See* T.C.A. § 40-35-115(b)(2), (4). The trial court noted that the defendant's criminal activity spanned 24 years and that "the only thing that stops [the defendant] from committing crimes is when he is in prison." With respect to the dangerous offender category, the trial court found that the defendant continued to carry firearms "when he knows he has no legal ability to do so" and noted that the only reason the defendant appeared to have shot Mr. Edwards was that the victim "apparently [was] not moving quickly enough when [the defendant] demanded property from Mr. Edwards." The trial court examined the *Wilkerson* factors and found that consecutive sentences "reasonably relate[] to the severity of the offenses for which the [d]efendant stands convicted and are, in fact, necessary in order to protect the public from further criminal acts by [the defendant]." These findings are more than "sufficient to warrant the imposition of consecutive sentences." *Adams*, 973 S.W.2d at 231. Accordingly, we find no error in the trial court's decision to impose consecutive sentencing.

*IV. Conclusion*

The evidence is sufficient to support the defendant's convictions. The trial court did not err by excluding the testimony of Ms. Miles or by imposing consecutive sentencing. Accordingly, we affirm the judgments of the trial court.

_____

JAMES CURWOOD WITT, JR., JUDGE